966 P.2d 151 (1998)
Mark Andre MARVELLE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 28004.
Supreme Court of Nevada.
September 24, 1998.
William Cole, Zephyr Cove, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Scott W. Doyle, District Attorney, Kristine L. Brown, Deputy District Attorney, Dina Salvucci, Deputy District Attorney, Douglas County, for Respondent.

OPINION
SPRINGER, C.J.
This is an appeal from convictions of child sexual abuse which resulted in appellant *152 Mark Marvelle's receiving a mandatory sentence of life imprisonment with the possibility of parole. Marvelle was released on bail pending this appeal.[1]
Marvelle's appeal is based principally upon the contentions that (1) the trial court erred in denying a psychological examination of the fifteen-year-old complaining witness, who claimed to have been molested in 1990; (2) the State misrepresented its intentions when, in response to Marvelle's motion for a psychological evaluation of the complainant, it advised the court that it "did not intend to call any experts"; and (3) he was denied a fair trial because the State's case rested almost exclusively on unopposable expert opinion evidence and "vouching" relating to the complaining witness's mental state and veracity, while he was denied the right to present his own expert testimony relating to mental state and veracity.
The State's principal response to Marvelle's contentions is that the witnesses who testified that the complainant was a competent and believable witness were not, strictly speaking, "experts" in the field of psychiatry or psychology and that, therefore, Marvelle was not prejudiced by the State's calling of these witnesses or by the district court's denial of his motion for an independent psychological examination of the complainant.
We conclude that Marvelle was entitled to a psychological evaluation of the complaining witness. We also conclude that the testimony of the State's witnesses appears to be of a sufficiently "expert" nature that the State incorrectly advised the district court when it informed the court that it "did not intend to call any experts." Finally, we conclude that it was unfair to permit an array of persons of varying degrees of expertise in psychology and the behavioral sciences to have access to the complaining witness and testify favorably for the State, while Marvelle was denied access to the complainant and thereby denied the right to present opposing evidence relating to the complainant's mental state and veracity. For these reasons we reverse the conviction and remand for a new trial.
The charges against Marvelle arose out of one incident claimed by his fifteen-year-old accuser, "Tammy," to have taken place during the summer of 1990. Marvelle and Tammy's mother were dating, and Marvelle was living with Tammy and her mother at the time of the incident. According to the State's brief, the incident took place "during July or August" of 1990, at a time when Tammy was "laying [sic] down on top of the covers next to Marvelle." Tammy did not report the alleged incident until four years later. The occasion of Tammy's mentioning the event was a meeting with a school counselor in which Tammy was complaining about the difficulties that she was having with her mother, difficulties relating to her mother's spending the night with a person who Tammy believed was a child molester, and difficulties relating to her mother's threats to commit suicide. During her conversation with her counselor, Tammy told her counselor that she had been molested when she was ten years old, describing an incident in which she claimed that she had taken her clothes off at Marvelle's request and that Marvelle had engaged in several sexual activities with her.
All parties agree that there was only one incident of claimed sexual abuse and that Tammy's charges are uncorroborated. The State concedes that this case is based entirely on whether Tammy is telling the truth.
Based upon information developed during preparation of the defense, defense counsel moved the court for a "psychological examination of [Tammy]." The motion referred to claimed "false allegations made by [Tammy]... based upon the conflicts that her mother has in her relationships with men" and upon "the relationship of the mother and daughter." Perhaps of most concern to defense counsel was Tammy's relationship with her real father, who ran an escort service and who was thought by Tammy to be involved in pornography. Tammy at one time claimed that her father "never has tried anything with me"; but later, at trial, there was testimony that Tammy's "real father" had molested *153 her at about the time Tammy claimed that Marvelle was the one who molested her. Still, Tammy expressed no enmity against her "real father" and said that she and her friend were going to become "madams," following in the footsteps of her father.
Attached to Marvelle's motion for psychological evaluation is a copy of Tammy's psychological history and case notes ("Contact Summary"), taken by Tammy's "therapist," Capa Casale, who testified for the State during trial. The motion recites that Marvelle "received information that [Tammy] in March of 1995 filled [sic] another allegation of sexual assault." The motion, as a whole, makes out a strong case that Tammy had a very disturbed family life and raises the possibility that she was molested by her "real father."
The preliminary examination and trial confirmed that Tammy was a very troubled young woman and that she had an extremely unhappy childhood. Tammy herself testified that from the time she was about five years old, her mother often threatened to abandon her. Her mother was violent, and on one occasion, Tammy called 911 as a result of her mother's battery upon her. On another occasion, police were dispatched to Tammy's home and were told by Tammy's mother that she was going to kill Tammy if Tammy was not removed from the home. Tammy admitted to having an active sex life and claimed that her mother had no objections to these activities so long as she did not engage in sex with adults.
Although Tammy expressed no objection to having a psychological evaluation and there is no issue of her "protection" in this case, the trial court denied Marvelle's motion. As stated, we conclude that the trial court erred by denying the motion.

REFUSAL TO ORDER PSYCHOLOGICAL EXAMINATION WHILE PERMITTING STATE'S WITNESSES TO TESTIFY ON TAMMY'S MENTAL STATE AND VERACITY
It is not easy to understand why the court denied Marvelle's motion. The motion makes a pretty clear case that Tammy was suffering from the kinds of emotional and psychological problems that call for an independent evaluation. Tammy was already under the care of a therapist and had no objection to seeing one appointed by the court. Given the fact that Tammy waited for over four years before mentioning the episode, the fact that she herself had no objection to the evaluation, and the fact that the State's entire, uncorroborated case rested upon Tammy's veracity, one would think that the evaluation would be ordered as a matter of course.
The trial judge took a rather different and unique approach in deciding not to grant the evaluation. The trial judge apparently took the position that psychiatrists and psychologists are unable to say when a witness is or is not telling the truth and that, therefore, there was no point in bringing one into the case. The trial judge commented: "[W]ith a psychological examination, how would they, a therapist or psychiatrist, be able to determine if she's telling the truth?" The answer to this rhetorical question is, of course, that a therapist cannot tell and cannot testify as to whether Tammy was telling the truth. The main problem with this case, however, is that Tammy's therapist, Casale, testified concerning the psychological manifestations connected with her stated assumptions that Marvelle was guilty as charged and that there was no "other perpetrator."
Marvelle did not move for a psychological evaluation because he wanted someone to testify that Tammy was not telling the truth; what Marvelle was after was an "evaluation" that would cast some light, from his perspective, on the kind of emotional problems that Tammy was having and the effect that these problems might have on her capacity to fabricate charges against him. There is much that the behavioral sciences would have to offer in Marvelle's defense, especially in light of the fact that the State's entire case was based on testimony, expert and otherwise, that Tammy was mentally and emotionally competent and telling the truth. This is the root of the prejudice suffered by Marvellethat others were allowed to testify as to Tammy's mental state and *154 "demeanor"[2] and that Marvelle had no way to defend himself against this testimony.
During his trial, Marvelle heard a number of child sex abuse experts testify on the "consistency" and veracity of Tammy's story. Marvelle makes a credible argument that most of these experts violated the State's representation that it would not rely on the testimony of experts, at least not as experts in the field of psychology. For example, consider Capa Casale. Although Casale was not yet qualified for licensure, she was acting in all respects as a psychologist and styled herself as a "marriage and family therapist." Therapist Casale gave therapy to Tammy and kept notes that are indistinguishable from the clinical notes maintained by true clinical experts. Therapist Casale testified in psychological jargon, using such current psychological terms as "subconsciously," "denial stage," and "anger stage." See, e.g., Elisabeth Kübler-Ross, On Death and Dying (1969).
Among therapist Casale's statements to the jury was this: "I believe that it's very common [] for a person when they [sic] really begin to face the fact that they [sic] were molested to become angry at people in their lives who subconsciously allowed that to happen." Casale further gave her opinion on the subject of the "actual or psychological or other type of benefit" that might have arisen from Tammy's telling her story and capped off her testimony by telling the jury that there was no "other perpetrator" than Marvelle.
Not only did the prosecution introduce expert psychological testimony relating to Tammy's behavioral characteristics and her mental and emotional state, as it related to the objective truth of her testimony, but it also pursued this subject in final argument. In referring to therapist Casale's testimony, the prosecutor, relying on the therapist's psychological jargon, told the jury that Tammy's psychological "problems" "all fit right into what Capa Casale was saying", namely, that "once you have [] disclosed this awful secret, you've come out of the denial stage where you've now actually now admitted out loud that it happened to you." Then, referring again to Casale's psychological testimony, the prosecutor argued that Tammy had gone through the "denial stage" and had "escalate[d] into some sort of anger phase," which she saw in Tammy's "anger and rebellion to her mother." Casale held herself out as a "therapist," and it is difficult indeed to maintain that she was not offering expert psychological testimony to the jury.
In cases such as this, where a State's expert testifies concerning behavioral patterns *155 and responses associated with victims of child sexual abuse, courts have recognized that this type of testimony puts the child's behavioral and psychological characteristics at issue, thus requiring the defense to have access to a psychological evaluation. Anderson v. State, 749 P.2d 369, 371 (Alaska Ct.App.1988). It is simply not fair in this case to allow testimony of this kind to be brought in by the State but not by Marvelle.
A district court has discretion to grant a request for a psychological evaluation of a child-victim, based on the facts and circumstances of each case, after considering four factors: 1) whether the State has employed an expert in psychiatry or psychology to examine the child; 2) whether there is a compelling need to protect the child; 3) whether evidence of the crime has little or no corroboration beyond the child's testimony; and 4) whether there is a reasonable basis to believe that the child's mental or emotional state may have affected her veracity. Keeney v. State, 109 Nev. 220, 226, 850 P.2d 311, 314 (1993). The district court concluded in this case that there was no compelling reason to protect the child and that there was little or no corroboration; consequently, the court's decision to deny a psychological evaluation had to be based on Keeney factors 1 and 4, namely, that the State was not going to call any experts and that Tammy's mental or emotional state could not reasonably have affected her veracity.
We conclude that the trial court erred in its consideration of the two, mentioned factors. First, it cannot be denied that the State's case rested almost entirely on Tammy's veracity. Marvelle's motion makes it very clear that the central issue in this case was going to be Tammy's mental and emotional problems and the effect that these had upon her veracity. Then, as it turned out, four witnesses, to varying degrees, based their testimony against Marvelle on psychological or pseudo-psychological grounds. The trial court was unjustified in basing its decision on the State's not employing an expert in the behavioral sciences because, as discussed above, this case was a one-sided "battle of the experts," with the State having all of the experts and Marvelle having, through no fault of his own, no experts.
With regard to the question of whether there was a basis to believe that Tammy's emotional or mental state may have affected her veracity, there is much reason, beyond her four-year delay in telling her story, to believe that Tammy's mental and emotional condition may have contributed to her telling the story that she did. For example, Tammy had confided to her friend that her real father had molested her at about the time that the incident in question occurred. Tammy told another friend that she refused to visit her real father because of something that had happened between the two. Further, another friend of Tammy's testified that Tammy used drugs, that she was manipulative, and that she would lie.
In Washington v. State, 96 Nev. 305, 307, 608 P.2d 1101, 1103 (1980), this court stated:
Generally, there is no compelling reason for a psychiatric examination unless there is little or no corroboration of the victim's allegations and the defense has questioned the effect of the victim's emotional or mental condition upon her veracity.
(Citations omitted.) In the present case, there is little or no corroboration, and Marvelle, most certainly, questioned the effect of Tammy's emotional or mental condition upon her veracity. In Lickey v. State, 108 Nev. 191, 195, 827 P.2d 824, 826 (1992), this court concluded that
unless competent evidence presents a compelling reason to protect the victim, it is error to deny a defendant the assistance of a defense psychologist or psychiatrist to examine the child-victim and testify at trial when the State is provided such assistance. Because police officers and the State's experts were permitted to conduct over a dozen interviews with the child-victim, the defendant should have been afforded at least one.
Under Lickey, since "protect[ing] the victim" is not an issue in the present case, it would appear to be error "to deny a defendant the assistance of a defense psychologist or psychiatrist to examine the child-victim and testify at trial when the State is provided such assistance." Id.
*156 The State argues that it did nothing contrary to the trial court's recital that the State had "indicated it had not employed it's [sic] own expert and did not intend to call any experts." First, claims the State, at no time did it actually "employ" any experts; so, the State claims, this representation to the court was accurate. The State cannot rely on the fact that it did not employ an expert. If, for example, Tammy's mother had employed the services of a psychiatrist and that psychiatrist testified for the prosecution, the State could not escape the ruling in Lickey merely because the psychiatrist was not in the State's employ. The point in Lickey is that it is not fair to "deny a defendant the assistance of a defense psychologist or psychiatrist... when the State is provided such assistance." Thus, it does not matter whether the experts were "employed" by the State or not; what matters is whether the State was assisted by behavioral experts while Marvelle was denied such assistance.
The State contends not only that it did not "employ" any experts but also that the witnesses for the State were not "experts in the field of psychiatry or psychology." Although one might argue that an expert in these fields must be a licensed professional, in today's world there are many people who testify in the field of behavioral science who are not licensed psychiatrists or psychologists. Capa Casale is an example of one of these kinds of "experts." The State's brief tells us that "Casale was Tammy's treating therapist" and that she was a "clinical administrator, marriage and family therapist for Basic Recovery Associates." According to the State's brief, Casale's "practice dealt mostly with marriage and family problems." Casale "began seeing Tammy as a patient in November, 1994."
Although the State represented to the court that it "did not intend to call any experts," it is hard to say that practicing therapist Casale, who (again, according to the State's brief) testified that she had seen her "patient" "six times from November 1994 to January 1995" and had "discussions with Tammy concerning the details of the sexual assault," about "Tammy's own sexuality," and about "family issues, conflicts between Tammy and her mother," was not an expert. Even given therapist Casale's psychological examination, diagnosis and therapy of Tammy, the State still maintains that it "cannot be said that such `expert' testimony in and of itself justified an independent psychological evaluation by a defense expert." Unless we were to hold that all those who give expert psychological testimony must be degreed and licensed psychologists or psychiatrists, the State's position cannot be upheld. Jurors are not generally aware of the differences in credentials among the multiplicity of behavioral experts. When a "therapist" who has examined and treated "patient" Tammy comes to the witness stand and explains to the jury, in psychological terms, how Tammy had been in a "denial stage" after she was molested and that this ripened into an "anger stage" precipitated by her mother's conduct, it must look to jurors very much like expert psychological testimony, testimony that is to be believed absent any expert opinion to the contrary.
In sum, then, the trial court was not justified in deciding to deny expert assistance to Marvelle on the basis that Tammy did not appear to be incompetent or that expert testimony could not enlighten the jury's understanding of mental or emotional influences on Tammy's veracity. Neither was the trial court justified in denying expert assistance to Marvelle on the basis of the State's representation that it "did not intend to call any experts." Although none of the witnesses who were called by the State to shore up Tammy's testimony were licensed experts in the field of psychiatry or psychology, therapist Casale, and to a lesser extent the other witnesses called by the State, testified in the manner of psychological experts, testified in opinion form, and testified in such a way that it was unfair not to permit Marvelle to defend himself with comparable experts who could offer comparable psychological and behavioral expertise. See, supra, footnote 2.

WITNESS VOUCHING
Four witnesses were permitted to vouch for Tammy's testimony. Tammy's school counselor was asked if the child's demeanor or statements were suspicious, and she answered *157 that the child's statements were consistent. The counselor also testified that she had no doubt as to the "perpetrator's" identity, namely, Marvelle. She went on to opine that children's allegations of this type are almost always valid. The police officer who first took the child's statement was permitted to recite the statement to the jury. The officer then testified that the statement was factual, that nothing the child stated was suspicious, and that he knew that something had transpired. A sheriff's deputy was permitted to relay the entire investigation scenario that occurred prior to his involvement, to state the facts of his interview with the child, and then to give his opinion that the child was telling the truth. Further, as previously discussed, the therapist Casale was permitted to give her expert opinion, testify to the molestation as told to her by the child, and then opine that the child was coming forward to prevent such a crime from again occurring. The therapist stated that the child identified the perpetrator as Marvelle and that she had no suspicion that there could be a perpetrator other than the accused.
It has long been the general rule that it is improper for one witness to vouch for the testimony of another, State v. Oliver, 188 Ga.App. 47, 372 S.E.2d 256 (Ga.Ct.App. 1988); Shepherd v. State, 538 N.E.2d 242 (Ind.1989), and this court has held several times that an expert is not permitted to testify to the truthfulness of a witness. Felix v. State, 109 Nev. 151, 849 P.2d 220 (1993); Lickey v. State, 108 Nev. 191, 827 P.2d 824 (1992); Townsend v. State, 103 Nev. 113, 734 P.2d 705 (1987). Here, we had unbridled testimony that the child was telling the truth and that the accused was the perpetrator, as well as the numerous repetitions of the accusatory statementa practice we have also held to be improper. Felix, 109 Nev. at 201-03, 849 P.2d at 253-55. It is true that Marvelle's counsel failed to object to any of this testimony vouching for the child's allegations; however, when this testimony is coupled with the State's improper expert testimony, the cumulative effect was clearly prejudicial to Marvelle.
We conclude that the trial court erred in refusing to permit the requested psychological examination, because there was little or no corroboration and because there was a reasonable basis for believing that Tammy's mental or emotional state may have affected her veracity. We also conclude that the judgment of conviction must be reversed because the trial court necessarily relied upon the State's incorrect representation that it would not engage the testimony of experts. Finally, we conclude that Marvelle was denied a fair trial because he was denied the opportunity to oppose the State's case by means of his own expert testimony relating to Tammy's mental and emotional state as it affected her veracity. Based on these conclusions, we reverse the judgment of conviction.
ROSE and YOUNG, JJ., concur.
SHEARING, J., with whom MAUPIN, J., joins, dissenting.
I would affirm the judgments convicting Marvelle of one count of sexual assault of a child under fourteen years of age and two counts of lewdness with a child under fourteen years of age.
Determining whether to grant or deny a motion for a psychological evaluation of a child-victim lies within the sound discretion of the trial court. Keeney v. State, 109 Nev. 220, 226, 850 P.2d 311, 315 (1993). This court must not disturb the trial court's determination unless the trial court abused its discretion. Id. The record does not support the conclusion that the district court abused its discretion in denying Marvelle's motion. In fact, the record reveals that the district court considered each of the four Keeney factors before concluding that a psychological examination of the child-victim was unwarranted.
The district judge clearly articulated his reasons for denying Marvelle's motion for psychological evaluation of the complaining witness. The district court found that two of the Keeney factors weighed in favor of granting Marvelle's motion. First, the district court found that the child-victim did not require protection; second, the district court *158 concluded that little or no evidence corroborated the child-victim's testimony. The district court also found, however, that two Keeney factors weighed heavily against granting Marvelle's motion. The State had not hired a psychologist or psychiatrist to examine the child-victim, and the district court concluded that no evidence suggested that the child-victim's mental or emotional condition affected her veracity. The district court analyzed the last Keeney factor as follows:
[T]he fourth part of the test is that, whether the victim's mental or emotional state may have affected her veracity as a witness, and that is the real crux of this case, the way I see it, in that the victim is now 15 years old, and that there's nothing in front of me that indicates that she is incompetent or doesn't understand, or is not able to perceive or recall or relate anything about what allegedly happened in this case.
In fact, the evidence appears to be the opposite, that she's able to relate it.
But, of course this is a debatable point. I asked Mr. Wright [defense counsel] what would happen with a psychological evaluation, how would they, a therapist or psychiatrist, be able to determine if she's telling the truth?
And I don't believe that Mr. Wright could give me an answer on that, because there is really no answer. That's why we have jury trials. But, I'll allow you to add to that, Mr. Wright, to make sure that this argument is preserved.
...
So, looking at the four-part test, two of the four prongs were not met, so I determined that it was inappropriate to appoint an expert in this case.
The record demonstrates that the district court considered each Keeney factor and reached an eminently sensible conclusion. I disagree with the majority's implication that each factor must be given equal weight. The Keeney case holds that the district court's decision must be based on the facts and circumstances surrounding each case. Thus, although the four named factors must be considered, one factor may outweigh all others in a particular case. Properly weighing the Keeney factors is best left to the trial court. The majority suggests that the State hired a mental health professional to examine the victim when in fact Capa Casale was merely a therapist who counseled the victim about her anxiety relating to the trial process. Casale was neither a psychologist or psychiatrist who examined the victim, nor a witness called by the State to testify about her mental condition. Casale testified about the behavior patterns of victims generally. Lickey v. State, 108 Nev. 191, 827 P.2d 824 (1992), is inapplicable here because the State did not conduct a psychological evaluation of the victim, and furthermore, Keeney superceded Lickey.
The majority cites Anderson v. State, 749 P.2d 369 (Alaska Ct.App.1988), in support of its conclusion that the defense must have access to a psychological evaluation of the victim if the State proffers testimony regarding the behavior patterns of victims generally. This reliance on Anderson, however, is misplaced. In Anderson, the court required a psychological evaluation of the young children who were victims in order to determine whether, despite their age, they were competent to testify at trial. Here, the district court specifically found "there's nothing in front of me that indicates that she is incompetent or doesn't understand, or is not able to perceive or recall or relate anything about what allegedly happened in this case." At the time of trial, the child-victim was fifteen years old and a junior high school student. The district court reasonably determined that the jury could properly evaluate the victim's state of mind when she testified.
I would hold that because Marvelle failed to object to the admission of State witness testimony at trial, and because I believe that admission of this testimony was not plainly erroneous, this court should not consider Marvelle's argument regarding witness vouching. Despite this position, I will, however, respond to the majority discussion of the State's witness testimony.
The majority incorrectly maintains that the State based its case on the testimony of witnesses who vouch for the reliability and truthfulness of the victim. The record contradicts *159 the majority position and demonstrates that the State based its case on the testimony of the victim and the corroborating testimony of the victim's mother.
The majority also mischaracterizes the testimony of Capa Casale, who counseled the victim briefly before trial. Casale testified about the stages of the grieving process. The majority deems her testimony "psychological jargon," despite wide acceptance of this theory in the field of mental health. This court is in no position to allow its personal opinion of the theory to affect its ruling. Testimony regarding typical victim behavior under circumstances similar to this case certainly could have helped the jury to understand why the victim did not report the incidents earlier. Casale testified as an expert on these matters, based on the expertese she gained earning her undergraduate degree in social work, master's degree in marriage and family therapy, and working as a social worker in crisis intervention at St. Mary's Hospital and counseling runaway adolescents at Community and Runaway Youth Services. Casale's testimony about stages of grief was unrelated to her work with the victim about the stress of the court process.
The decision to admit evidence lies within the sound discretion of the trial court. The trial court's determination will not be overturned absent manifest error. Petrocelli v. State, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). Furthermore, NRS 50.345 specifically authorizes admission of the type of testimony offered by Casale as an appropriate response to the arguments offered by Marvelle. NRS 50 .345 provides "[i]n any prosecution for sexual assault, expert testimony is not inadmissible to show that the victim's behavior or mental or physical condition is consistent with the behavior or condition of a victim of sexual assault." The majority suggests that because the district court denied Marvelle's motion for a psychological evaluation of the victim, that admission of Casale's relatively innocuous testimony about the grieving process constitutes plain error. This suggestion is unsupported by legal authority and flies in the face of the statute and the applicable standard of review granting deference to the trial court.
The majority improperly claims that the testimony of the victim's school counselor, the initial investigating police officer and the police detective addressed the victim's "mental health and `demeanor'" and maintains that Marvelle had "no way to defend himself against this testimony." No witnesses testified as to the victim's mental health except peripherally in response to defense counsel's questions. Defense counsel cross-examined each witness extensively in an attempt to point out inconsistencies in the victim's various statements and to question her mental health.
Based on defense counsel's opening statement, it is clear that the defense strategy was to encourage the various witnesses who heard the victim's testimony to repeat what the victim stated at various times in order to point out the inconsistencies. The defense counsel said in the opening statement, "You're going to hear some real discrepancies in [the victim's] testimony on particular facts and what happened on this occasion, and what she told someone later, and what she told someone a third time." Defense counsel followed through in his cross-examination of the witnesses and, in attempting to attack the victim's credibility and mental state, he elicited much of the testimony favorable to the victim, as well as her problematic behavior.
None of the State's witnesses vouched for the victim's credibility so as to create plain error. The victim's school counselor testified only that the victim's statements were "consistent." Only when defense counsel pressed the counselor on teenage lying, did she answer, "I think if I had to pick between the two [the victim and another teenager in the same school] as a counselor, I'd pick [the victim]." Since defense counsel elicited this testimony, the defendant cannot now complain that its admission was erroneous.
The initial investigating officer did not vouch for the victim's credibility. He indicated that he was merely preparing a "courtesy report" for another jurisdiction and that he didn't elicit much detail. He did testify that he "knew something had transpired," but he said it in the context of having enough information that it should be reported to the *160 police department that had jurisdiction. He was not expressing a final judgment on her credibility.
Although the detective from Douglas County testified that he believed the victim's story, his statement was in the context of describing the interrogation technique he uses in his capacity as a police officer to test whether a witness is in fact telling the truth. Even if admission of the statement was error, it constituted only harmless error. The jury had to know already that the police detective believed the victim since implicit in the police detective's decision to submit the case for prosecution is his belief in the truth of the testimony of the victim. The majority states that admission of the police detective's statement opinion disadvantaged Marvelle because "he had no opportunity to present contrary evidence of comparable weight." Marvelle certainly took advantage of the opportunity to conduct extensive cross-examination, and he had the opportunity to bring in any witnesses providing contradictory testimony. He also testified himself. The jury made the ultimate determination of who was telling the truth.
The majority questions the victim's credibility, citing the fact that the victim has had problems in her relationships and behavior. Unfortunately, victims of sexual abuse usually have problems in these areas by the very reason of the fact that they have been sexually abused. That is why it is particularly important that the jurors see the witnesses and listen to all of the evidence, both good and bad, so that they may judge the truth. This court is in no position to make that determination or even to suggest that the jury's determination is wrong.
MAUPIN, J., concurs.
NOTES
[1] It is worth noting that the trial judge made the following comment during sentencing: "This penalty is too severe for the nature of this particular crime and for what your background shows. I think you could be a productive person and a life sentence is not appropriate."
[2] School counselor Carol Bocks testified as to Tammy's "demeanor," testifying that Tammy's story was "consistent" and that she did not "seriously... doubt something like this, an allegation that you were hearing" and that there was no "more than one perpetrator." Bocks was not a psychologist, but she identified herself as a "counselor," whose job it is to deal with the emotional problems of students. She testified as to her experience in dealing with child sex-abuse cases; and, although she did not claim to be a "therapist," as did Capa Casale, she presented herself as having a certain degree of expertise in child behaviorsufficient, in any event, to testify that Tammy's story was consistent, that she had no doubts about Tammy's veracity, and that there was no perpetrator other than the accused Marvelle.

Another example of expert testimony being offered by a witness who might not qualify as being truly an "expert" is that of a specialist in child abuse investigations, Police Officer Steve Fiori. Based on his experience and expertise in investigating child sex-abuse cases, Officer Fiori opined that Tammy's story was indeed factual and that from it he knew "that something had transpired." This officer, along with other witnesses, "vouched for" Tammy's story, and did so not from the perspective of a percipient witness but, rather, as an expert who knows a guilty sex offender when he sees one. Although the State's representation that it would not call any experts may not have been violated by calling child sex-abuse experts Bocks and Fiori to give their opinions, Marvelle certainly was put to a great disadvantage by this opinion evidence going to the jury when he had no opportunity to present contrary evidence of comparable weight.
Finally, mention should be made of another expert, Detective Paul Pabon, who presented himself not as a behavioral or psychological expert, but, rather, as an expert in the field of "who-dunnit." Detective Pabon testified that, based on his experience and training, it was his "belief" that "Mr. Marvelle was the perpetrator." This is mentioned not because it constituted a violation of the State's promise not to call any experts but merely as an illustration of the kind of evidence that the State relied on to convict Marvellejust bring in people who will say he is guilty.